**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| C. WILLIAM HELM, MB.BChir | ) | **CASE NO. 3:16-CV-00771-TBR-DW** |
| | ) | |
| Plaintiff | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| ALLISON RATTERMAN, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

Dr. William Helm submits this Amended Complaint against Dr. Allison Ratterman, Angela Koshewa, Dr. Pamela Feldhoff, and Dr. Eleanor Lederer, in their individual capacities.

## NATURE OF THE ACTION

Helm seeks a judgment declaring that Defendants' actions toward him constitute fraud by omission and fraudulent concealment, intentional interference with prospective advantage, tortious interference with contract, and breach of fiduciary duties. The principle of equitable tolling applies to all of Helm's claims. Helm seeks compensatory and punitive damages for Defendants' action, as well as the recovery of his attorney fees and costs.

## THE PARTIES

### Dr. Helm

1.       In 1976, Helm received his Medical Degree from the University of Cambridge. From 1989-2000, Helm served as a visiting instructor in the Division of Gynecologic Oncology at the University of Alabama at Birmingham, an Assistant Professor in the Division of Gynecologic Oncology at Temple University, and a consultant in Gynecologic Oncology at the Christie Cancer Hospital in England. From 2000-10, he was a faculty member of the Department of Obstetrics, Gynecology, and Women's Health ("Department") and the Division of Gynecologic Oncology ("Division") at the University of Louisville ("University") School of Medicine ("School").

1

**Dr. Ratterman**

2.      Since 2002, Allison Ratterman has been the Director of the University's Research Integrity Program and is intimately familiar with the University's "Policy for Responding to Allegations of Research Misconduct" ("ORI Policy," attached as *Ex. A*) Ratterman testified that, as Director of the Research Integrity Program she (a) is merely a "facilitator" for the Research Integrity Ombudspersons ("Ombudsperson") in the Research Integrity Program; (b) does not "supervise" the Ombudspersons or tell them how to do their work; and (c) is obligated "make sure that research misconduct proceedings move forward with the utmost integrity."

3.      According to Dr. Robert Staat, the "lead" Ombudsperson at the University's Health Science Campus from 2005-10, Ratterman "crossed the Ts and dotted the Is" on complying with research misconduct policies and procedures.

**Ms. Koshewa**

4.      From 2002-14, Angela Koshewa served as University Counsel. Under the ORI Policy, the only role for Koshewa in a research misconduct proceeding was to review "for legal suf-ficiency (a) the Inquiry Panel report *(Ex. A, p. 15)* and (b) the draft Investigation report. *(Id., p. 28)*

**Dr. Feldhoff**

5.      From at least 2009-11, Pamela Feldhoff served as the University's Associate Vice President for Research. During this period, Feldhoff supervised Ratterman and worked closely with her on internal compliance issues and on the "details and regulations" of research misconduct issues.

**Dr. Lederer**

6.      From at least 2009-11, Eleanor Lederer served as Associate Ombudsperson for the University's Health Sciences Campus, which included the School. In 2009-10, her only involvement as Ombudsperson were the research misconduct allegations against Helm. As an Ombudsperson

2

under the ORI Policy, Lederer had myriad mandatory and fiduciary duties. Lederer had "the ultimate responsibility for interpretation of the ORI Policy. In 2009-10, Lederer relied on advice from Ratterman about her responsibilities as Ombudsperson.

## JURISDICTION AND VENUE

7.      Under 28 U.S.C. §§ 1331, 1332, 1367, the Court has jurisdiction over Helm's claims. Under 28 U.S.C. § 1391(b), venue is proper in this judicial district because Defendants reside in this judicial district, and the events and omissions giving to Helm's claims occurred in this judicial district.  Because of the same reasons, the Court has personal jurisdiction over the Defendants.

### Helm's contractual relationships with the University

8.      In April 2000, Helm signed an offer letter to join the faculty of the Division as an Associate Professor for a renewable three-year term. His academic duties were contractually defined as: (a) teaching medical students, residents, and Gynecologic Oncology fellows; (b) continuing and initiating research projects; and (c) treating gynecologic oncology patients.

9.      On May 31, 2005, Helm's Department Chair, Dr. Christine Cook ("Christine Cook"), recommended that Helm's appointment as "tenure track" Associate Professor be replaced by a one-year "term track" appointment from August 2005-July 2006. In 2006, 2007, 2008, and 2009, Christine Cook recommended that Helm be reappointed as Associate Professor (term track) for one-year periods. Helm's appointment and subsequent reappointments were subject to the University's "Redbook," which is the "basic governance document of the University."

10.     In conducting the affairs of the University, every University employee must comply with applicable laws as well as the policies and procedures of the University of Louisville.

11.     For his claims, Helm has relied upon all provisions of the University's (i) ORI Policy; (ii) Redbook; (iii) Code of Conduct; (iv) Non-Retaliation/Non-Retribution Policy; and (v)

Promotion, Appointment and Tenure ("PAT") Policy. For his claims, Helm has relied on all acts and omissions by persons charged with implementing all University policies or procedures including (i) Research Integrity Program Director Ratterman; (ii) Associate Vice President for Research Feldhoff; (iii) University Counsel Koshewa; and (iv) Ombudsperson Lederer.

12.     On July 18, 2009, the PAT Committee of the Department voted to promote Helm to full Professor. Pursuant to the PAT Policy *(Ex. B)*, "Promotions to Professor should be awarded with care and only to those who show promise of continuing efficiency … in teaching, research, and service with consideration for their work assignment." *(Id., p. 6)* Moreover, "Superior achievement and promise of continuing superiority must be evidenced by excellence in an area of assignment that meets or exceeds 20% effort on, and is documented in [Helm's] annual work plan." *(Id.)*

13.     Department Chair Cook whole-heartedly supported Helm's promotion, as more fully described in Cook's July 18, 2009, letter to then-Dean Edward Halperin. *(Ex. C)* On July 28, 2009, Helm's fully completed PAT file was delivered to Associate Dean of Faculty Affairs Tracy Eells, whose sole job was to provide Helm's PAT file and recommendations to the School of Medicine PAT Committee for final approval at its next meeting on August 19, 2009.

### The "ORI Policy" and the "very serious" and "life-altering" nature of research misconduct allegations

14.     In 2002, the University adopted its ORI Policy to establish "a framework of methods and principles for assessing, and conducting inquiries and investigations regarding allegations … of 'research misconduct.'" *(Ex. A, p. 4)* The policy stated its intentions:

> This policy and procedures are intended to protect the rights and reputations of those alleged to have committed research misconduct, and those who make such allegations, while at the same time ensuring that the substance of all allegations will be assessed fairly and conscientiously.

*(Id., p. 5)*

15.   The ORI Policy also places a special responsibility on those administering it:

All individuals involved – whether making allegations or the object of allegations, or otherwise participating in inquiries and investigations – are cautioned to familiarize themselves with the specific requirements promulgated by federal agencies, especially the National Institutes of Health/Office of Research Integrity (NIH/ORI) and the National Science Foundation (NSF), responsible for the oversight of the research misconduct process. These requirements, which may apply to certain determinations made under these policies and procedures (e.g., evidentiary standards, bases for findings and conclusions, etc.) can be found at:

NIH/ORI: http://www.ori.dhhs.gov.html/misconduct/introduction.asp
NSF: http://www.oig.nsf.gov/misconscieng.htm

*(Id.)*

16.   "Research Misconduct" includes "plagiarism in proposing, performing or reviewing research…. *Plagiarism* is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit [and] also means the substantial unattributed copying of another's ideas, processes, results, or words." *(Id., p. 7) (Emphasis in original)* An "Allegation" is "a disclosure of possible research misconduct through any means of communication." *(Id., p. 5)*

17.   Staat, the "lead" Ombudsperson from 2005-10 at the Health Sciences Campus, testified that allegations of plagiarism are "serious business." Staat agreed that "to accuse anyone of research misconduct is a very serious matter," and the mere accusations of research misconduct can "ruin reputations" and "destroy lives and livelihoods." Staat testified the University goes "to all extremes to protect" the ORI Policy and the reputation of persons accused of research misconduct.

18.   Ratterman testified that Helm's research misconduct proceeding was "very serious" and she was obligated "make sure that [it] move forward with the utmost integrity."

19.   Lederer testified that the mere "accusation of research misconduct can terminate somebody's career" and that accusations of plagiarism against a professor can be "life-altering."

5

20.     In November 2010, the University's Executive Vice President for Research, Dr. William Pierce, told Helm that "integrity in all [University] endeavors is of utmost importance."

21.     Given their positions as administrators of the Research Integrity Program, Ratterman, Feldhoff, and Lederer owed fiduciary duties to Helm relating to the discharge of those duties. Because Koshewa illegally and improperly injected herself into the research misconduct claims against Helm, she, too, owed fiduciary duties to him.

22.     A Research Integrity Ombudsperson assesses "allegations" to determine if they met the definition of research misconduct and oversees inquiries and investigations. The Associate Ombudsperson assumes those responsibilities if the Ombudsperson is absent or recused. *(Ex. A, p. 7)*

23.     An "Institutional Member" is "a person who is employed by, or is an agent of … [the University]. Institutional members may include, but are not limited to, officials, tenured and untenured faculty…." *(Id., p. 6)* "All institutional members will report observed, suspected, or apparent research misconduct to the Research Integrity Ombudsperson. Any official who receives an allegation of research misconduct must report it immediately to the Ombudsperson." *(Id., p. 11)*

24.     The Ombudsperson "shall limit disclosure of the identity of respondents … to those in a need to know in order to carry out a thorough, competent, objective and fair research misconduct proceeding …." *(Id., p. 12)* and "shall, in cooperation with other institutional officials, take all reasonable and practical steps to protect and restore the positions and reputations of all parties to [a research misconduct] dispute and counter actual or potential retaliation against them by other … institutional members." *(Id., p. 9, eighth bullet point)*

25.     Lead Ombudsperson Staat testified that the University "adopted [the ORI Policy] for all research integrity issues" – even those that do not involve federal funding and that the policy was the "overriding guidelines" for all allegations of misconduct, regardless of the funding source.

6

26.     Associate Ombudsperson Lederer testified that the ORI Policy "protect[ed] all research from plagiarism."

27.     If federally supported research is not involved in a research misconduct proceeding and the ORI Policy does not "apply," the University's "Executive Vice President for Research must approve any significant variation in procedure prior to its initiation" and "[a]ny change from normal procedures must ensure fair treatment to the subject of the inquiry or investigation." *(Ex. A, p. 4)*

### The Redbook

28.     The Redbook is the "basic governance document of the University." In the 2009 version, the Redbook stated, "It is expected that every employee, in conducting the affairs of the University, will comply with applicable federal, state, and local laws as well as the policies and procedures of the University of Louisville." *(Ex. D, § 2.5.8)*

### The Code of Conduct

29.     On November 12, 2009, the University adopted a "Code of Conduct" which applied to all of its faculty, staff, and administrators. *(Ex. E)* The Code of Conduct states that all University members share core values of "honesty and rigor in all pursuits" and "transparency and integrity in decision-making." *(Id., p. 1)* Under the Code of Conduct, in conducting the affairs of the University, every University employee will:

a.   comply with applicable federal, state, and local laws. *(Id.)*

b.   "act according to the highest ethical and professional standards of conduct." *(Id., p. 2)*

c.   be "fair" and "to speak candidly and truthfully" *(Id.)*

d.   "learn and follow the laws, regulations, contracts, and University policies and procedures applicable to University activities" *(Id., p. 3)*

e.   "be proactive to prevent and detect any compliance violations" and "report suspected violations to supervisors or other University officials" *(Id.)*; and

f.   "follow document preservation and retention guidelines." *(Id., p. 4)*

7

**The Non-Retribution Policy**

30.     In April 2008, the University adopted a "Non-Retaliation/Non-Retribution Policy" that emphasized the University "is committed to conducting its affairs in full compliance with the law and its own policies and procedures" in order to strengthen and promote "ethical and fair practices and treatment of all members of the University community." *(Ex. F, p. 1)*

31.     The Non-Retribution Policy stated that (a) "all employees and others holding positions of fiduciary duty with the University are obligated to perform these duties in compliance with all applicable laws and University policies and procedures" and any person "with knowledge of or suspicion of misconduct … or other wrongdoing must be immediately reported to University management [or] the Institutional Compliance Office …" *(Id.)*

**Dr. Doug Taylor brings a plagiarism complaint against Helm pursuant to the ORI policy, and unbeknownst to Helm, research misconduct proceedings ensue.**

32.     On July 12, 2009, Dr. Doug Taylor, a member of Helm's Department and Division, advised Ombudsperson Staat that Helm had used Taylor's grant application "to submit as his own research for funding." On July 13, 2009, Staat advised Taylor that his claim against Helm:

> [definitely] falls under the guidelines for research misconduct. We take this type of issue very seriously and because NIH [National Institutes of Health] funds may be involved we [definitely] need to initiate a review of this issue and get a full understanding of the potential problem.

*(Ex. G)* Under Staat's advice, Taylor met with Ratterman to file a research misconduct complaint.

33.     On July 14, 2009, Ratterman interviewed Taylor, and noted that Helm's $80,000 "Ctr of Environmental Genomics" grant ("CEGIB grant") was a "Federal Flow Through." The University designated Taylor's research misconduct claim against Helm as Case No. 20090714.

34.     On or about July 22, 2009, Ratterman reassigned Staat to a separate research miscon-duct investigation, and she assigned Lederer as Ombudsperson to Helm's research misconduct case.

35.     Helm relied on Ratterman and Lederer to follow and implement the ORI Policy, and disclose to him the right to preserve his position and reputation.

36.     If Ratterman or Lederer intended to use a process other than the one set forth in the ORI Policy regarding the research misconduct allegations against Helm, they had a duty to (a) obtain permission from the University's Executive Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm.

### Fraudulent Concealment No. 1 (July 20, 2009)

37.     Shortly after receiving Taylor's research misconduct narrative on July 14, 2009, Ratterman communicated with Staat – via a call or a face-to-face meeting – regarding Taylor's plagiarism allegation against Helm. Ratterman did not keep copies of her notes of the Staat communication.

38.     On July 20, 2009, Ratterman knew that Ombudsperson Staat had determined that Taylor's plagiarism allegations against Helm "[fell] under the guidelines for research misconduct" and that "because NIH [National Institutes of Health] funds may be involved we [definitely] need to initiate a review of this issue and get a full understanding of the potential problem."

39.     Ratterman knew that Helm was to be promoted to professor in the summer of 2009.

40.     On July 20, 2009, Ratterman, pursuant to Ombudsperson Staat's directive, assembled an Inquiry Panel consisting of faculty members Charlene Mitchell, John Naber, and Douglas Darling. *(Ex. H)* Ratterman testified that her July 20, 2009 email messages to the proposed Inquiry Panel members meant (a) "that an assessment has been made [by Staat] and that we're moving to an Inquiry Panel as it relates to the allegation against Dr. Helm" and (b) based on the fact that she was assembling an Inquiry Panel on July 20, 2009, we can "assume that the jurisdictional criteria of 42 CFR § 93.102(b) were met" (including the federal funding requirement) regarding the allegation.

41.     If Ratterman intended to use a process other than one set forth in the ORI Policy regarding the research misconduct allegations against Helm, she had a duty to (i) obtain permission from the University's Executive Vice President for Research to use an alternate process and (ii) disclose that alternate process to Helm.

42.     Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him.

43.     Ratterman failed to disclose and describe to Helm that any process other than the ORI Policy process would be used to evaluate the research misconduct allegations made against him.

44.     After Ratterman reassigned Lead Ombudsperson Staat to another research misconduct investigation on July 22, 2009, Ratterman had a duty to notify Helm of the inquiry.

45.     By concealing the inquiry against Helm, Ratterman induced Helm (a) to not invoke the protections of the ORI Policy, any alternate research misconduct policy approved by the University's Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, the PAT Policy and (b) to not protect his position and reputation at the University.

46.     In violation of numerous University policies and contracts between the University and Helm, Ratterman deleted or destroyed documents relating to Staat's July 14-20, 2009 assessment of the claim against Helm. Ratterman's acts and omissions deprived Helm access to critical pieces of proof and evidence in all Helm research misconduct proceedings (including court actions), including communications between Staat and Ratterman in July 2009. Ratterman also concealed her fraudulent scheme and intent from Helm until July 2013, when the University was forced to provide documents pursuant to a subpoena in <u>Helm v. Cook</u>., Case No. 10-CI-05997, Jefferson Circuit Court, Division Six.

47.     As a direct and proximate result of Ratterman's concealment of the above material facts, Helm lost his position, his promotion, his research, his patients, his referring physician base, his professional, personal, and practice goodwill which had taken ten years to develop, and his reputation at the University. Helm was also forced to sell his home in a down real estate market.

**Fraudulent Concealment No. 2 (August 11-14, 2009)**

48.     On August 11, 2009, Ratterman notified Lederer, an untrained and newly appointed Ombudsperson, that she had been assigned to the research misconduct case against Helm. *(Ex. I)* On August 13, 2009, Ratterman described Helm's case as "quite urgent" and she told Lederer that she "just need[s] to brief you on the details before we call the [Inquiry] panel together for its first meeting." *(Id.)*

49.     Lederer relied on Ratterman's advice for the application of the ORI Policy.

50.     Pursuant to the ORI Policy, Ratterman and Lederer were required to notify Helm of the "quite urgent" research misconduct charges against him and the composition of the Inquiry Panel. Ratterman and Lederer disregarded the mandate. Because of their failure, Helm did not invoke the protections of the ORI Policy or any alternate policy approved by the Vice-President for Research, including the right to have his position, promotion, and reputation protected.

51.     Ratterman and Lederer knew that Helm was to be promoted to professor in the summer of 2009. Helm's promotion binder, which was completed and delivered to the Dean's office on July 27, 2009, was withheld for a pro forma approval at the School of Medicine's PAT committee meeting on August 19, 2009.

52.     In October 2009, Helm's promotion was rescinded due to "research concerns" and accusations that he "stole" Taylor's research ideas. Helm received no notice of the proposed rescission, and was not provided an opportunity to learn about the "research concerns." The

concealment of the basis for rescission of Helm's promotion caused massive and permanent damage to Helm's research reputation, and interfered with his cancer research activities.

53.    Under the ORI Policy, Ratterman and Lederer had affirmative duties to protect Helm's position and reputation. If Ratterman or Lederer were going to use a process other than the process set forth in the ORI Policy regarding the research misconduct allegations against Helm, they had a duty to (a) obtain permission from the University's Executive Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm.

54.    Helm relied on Ratterman and Lederer to follow and implement the ORI Policy or to notify Helm of any alternate research misconduct policy approved by the Vice President for Research, and disclose to Helm any right to preserve his position and reputation.

55.    Ratterman testified that Helm's position and reputation should have protected.

56.    Lederer could not recall whether Ratterman told her that Staat had "assessed" the allegations against Helm. In violation of numerous University policies and contracts between the University and Helm, Ratterman and Lederer deleted, destroyed, or lost documents relating to their August 2009 communications. The acts and omissions of Ratterman and Lederer deprived Helm access to critical pieces of proof and evidence in all Helm research misconduct proceedings (including court actions), including communications between Ratterman and Lederer in 2009.

57.    Ratterman concealed her July 14, 2009 interview form and notes with Dr. Doug Taylor from Lederer. If Ratterman had provided that interview form and notes, Lederer "probably would have asked for a ruling on whether [Helm's CEGIB grant involved federal funds.]"

58.    Ratterman and Lederer concealed their fraudulent scheme and intent from Helm until late 2015, when Ratterman and Lederer were deposed in <u>Helm v. University of Louisville</u>, Case No. 15-CI-01410, Jefferson Circuit Court, Division Seven.

59.     By concealing and continuing to conceal the inquiry against Helm, Ratterman and Lederer induced Helm to (a) not invoke the protections of the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, and the Non-Retribution Policy and (b) to not protect his position and reputation.

60.     As a direct and proximate result of the concealment of these material facts by Ratterman and Lederer, Helm lost his position, his promotion, his research, his patients, his referring physician base, his professional, personal, and practice goodwill which had taken years to develop, and his reputation. Helm was also forced to sell his home in a down real estate market.

**Fraudulent Concealment No. 3 (sometime after August 14, 2009)**

61.     On November 2, 2015, Ratterman testified that at some indeterminate time after August 14, 2009, she decided that Taylor's plagiarism charge against Helm was "an internal case."

62.     Ratterman testified that, after she classified Taylor's complaint against Helm as "internal," she spoke to University Counsel Koshewa about the matter. Koshewa, however, was to have no role whatsoever in research misconduct cases, other than reviewing the reports of the Inquiry Panel and the Investigative Panel for "legal sufficiency." Under at least the ORI Policy, Code of Conduct, and Non-Retribution Policy, Koshewa had a duty to disclose to Helm her improper and unethical contact with Ratterman. Koshewa concealed from Helm her contact with Ratterman.

63.     Ratterman testified that even though the ORI Policy does not have an "internal" classification of research misconduct complaints, Associate Ombudsperson Lederer would advise a person defending an "internal" research misconduct (Helm) of the implications of the "internal" designation and "would direct them as to the proceedings."

64.     Ratterman, Koshewa, and Lederer had a duty to notify Helm that the research misconduct allegations against him were deemed "internal."

13

65.     Helm relied on Ratterman, Koshewa, and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him.

66.     Ratterman, Koshewa, and Lederer concealed from Helm their decision to classify Taylor's July 14, 2009 research misconduct claim against Helm as "internal." Ratterman, Koshewa, and Lederer provided to Helm no notice whatsoever which indicated that the claims against him were "internal." The first notice to Helm of these "internal" allegations came in the fall of 2015, when Ratterman verified certain interrogatory answers of the University.

67.     By no later than September 24, 2010, Ratterman, Koshewa, and Lederer knew that the National Institute of Environmental Health and Sciences ("NIEHS") funded more than 90% of the University's Center for Environmental Genomics and Integrative Biology ("CEGIB"). By then they knew that the "internal" designation to the plagiarism complaint against Helm was improper because CEGIB funding constitutes "federal funding."

68.     Associate Vice President for Research Feldhoff testified that CEGIB was "externally funded," i.e., federally funded and "Provost approved." Feldhoff testified Helm's CEGIB grant is a federal flow through and that 93% of Helm's $60,000 CEGIB grant originated from NIEHS.

69.     Ratterman, Koshewa, and Lederer concealed their fraudulent scheme and intent from Helm until late 2015. By concealing and continuing to conceal the inquiry against Helm, and the other material facts described above, they induced Helm to not invoke the protections of the ORI Policy, any alternate research misconduct policy approved by the University's Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy. And they failed to advise Helm of his rights in an "internal" research misconduct case.

14

70.     As a direct and proximate result of the concealment of the above material facts by Ratterman, Koshewa, and Lederer, Helm lost his position, his promotion, his research, his patients, his referring physician base, his professional, personal, and practice goodwill which had taken years to develop, and his reputation. Helm was also forced to sell his home in a down real estate market.

71.     By deeming the case against Helm to be "internal," Ratterman, Koshewa, and Lederer failed to protect Helm's confidentiality and permitted Helm's name to be publicized as a plagiarist in numerous public court filings and in "open record" University administrative proceedings, even though Helm was exonerated on all plagiarism allegations. On November 2, 2015, Ratterman admitted that the University failed to protect Helm's confidentiality.

72.     Lederer kept none of her notes of meetings or conversations or email messages she exchanged with Ratterman relating to the research misconduct allegations against Helm. Lederer exchanged email messages with Koshewa, but did not keep copies of the messages. The acts and omissions of Ratterman, Koshewa, and Lederer deprived Helm access to critical pieces of proof and evidence in all Helm research misconduct proceedings (including court actions), including the communications between Ratterman, Koshewa, and Lederer beginning on August 14, 2009.

73.     By engaging in the above conduct, Ratterman, Koshewa, and Lederer deprived Helm of access to proof relating to the internal classification of the research misconduct allegations against him. Among the destroyed or missing documents are communications between and among Lederer, Ratterman, and Judy Bristow, who worked for the University's Office of Grants Management.

74.     By engaging in the above conduct, Ratterman and Koshewa deprived Helm of access to proof relating to the internal classification of the research misconduct allegations against him because the University has deemed Ratterman's communications with Koshewa protected from disclosure of the attorney-client privilege or the work product doctrine.

15

**Fraudulent Concealment No. 4 <u>(February 18, 2010 and March 12, 2010)</u>**

75.     Even though Ratterman, on August 13, 2009, described the research misconduct allegations against Helm as being "quite urgent," she and Lederer waited until February 18, 2010 – six-days after Helm was notified of the non-renewal of his contract – to seek his CEGIB grant application. Ratterman concealed from Helm her delay in seeking the CEGIB grant application because she wanted to make sure, perhaps on orders from others at the School of Medicine, that any research misconduct proceeding against Helm would not begin until he had been notified that his contract for employment would not be renewed.

76.     According to Ratterman, Feldhoff, and Lederer, Helm's CEGIB grant application and award related directly to the research misconduct claim alleged by Dr. Doug Taylor against Helm, and the "internal" designation assigned to that claim made by at least Ratterman. If the CEGIB application and award determined whether the ORI Policy "applied" to the "quite urgent" July 2009 plagiarism claims by Taylor against Helm, Ratterman and Lederer had a duty to immediately seek and retrieve the application and award.

77.     But Ratterman and Lederer waited until February 18, 2010 to seek the CEGIB grant application and award from CEGIB Director Dr. Ken Ramos. *(Ex. J)* Ramos did not respond, so Ratterman and Lederer sent another request on March 12, 2010. *(Id.)* Ramos again did not respond. So Ratterman and Lederer halted activity on Helm's "quite urgent" case until his last week at the University. The University, citing the attorney-client privilege, claims that Helm is not entitled to review documents associated with Ratterman's efforts from, March 12 – July 22, 2010, to acquire the CEGIB application and award.

78.     Ratterman and Lederer had a duty to advise Helm of any problem they had in locating his CEGIB grant application and award. They failed to fulfill that duty.

16

79.     If Ratterman and Lederer would have asked Helm, he would have provided the CEGIB application and award to them and it would have shown that the grant was supported by federal funds. Ratterman and Lederer would then have been required to provide Helm the ORI Policy protections. In November 2015, Ratterman testified that she did not ask Helm for the application because it needed to come from an "authoritative source," but she then admitted that no University policy required the application and award to be provided by an "authoritative source."

80.     Helm relied on Ratterman, Koshewa, and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the Vice President for Research for any research misconduct allegation made against him.

81.     The acts and omissions of Ratterman and Lederer, which were concealed from Helm until Ratterman and Lederer provided deposition testimony in late 2015, induced Helm to not invoke the numerous rights and protections of the University's ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, Code of Conduct, Non-Retribution Policy, and the PAT Policy. And neither Ratterman nor Lederer advised Helm of his rights as a respondent in an "internal" research misconduct case.

82.     In November 2015, Ratterman testified that she "cannot recall" why she waited until February 2010 to seek a copy of Helm's CEGIB grant application and award. This memory loss about critical events in 2009-10 has denied Helm access to a source of proof and evidence in all Helm research misconduct proceedings (including court actions) that may support his claim.

83.     Some or all documents relating to Ratterman's delay in seeking Helm's CEGIB grant application and award have been lost, deleted, or destroyed, or the University has claimed that such documents are protected from disclosure by either the attorney-client privilege or work product doctrine. These actions have denied Helm access to a source of proof and evidence that may

17

support his claim. Some or all documents relating to Ratterman's communications with Judy Bristow and the University's Office of Grants Management have been deleted or destroyed, thereby denying Helm access to a source of proof and evidence in all Helm research misconduct proceedings (including court actions) that may support his claim.

## Fraudulent Concealment No. 5 (July 22-24, 2010)

84.     On July 22, 2010, Ratterman decided to ignore Lead Ombudsperson Staat's July 14-20, 2009 "assessment" of the plagiarism allegations against Helm. Ratterman had no authority under any University policy to ignore Staat's 2009 assessment, and she had a duty to notify Helm of her decision, especially in light of the "life-altering" and "quite urgent" research misconduct allegations made against him in July 2009 by Taylor.

85.     Ratterman failed to notify Helm of her decision to ignore Staat's July 2009 assessment of the claims against Helm. Instead, on July 22, 2010, Ratterman asked Associate Ombudsperson Lederer to "assess" the July 2009 plagiarism claims made by Taylor against Helm.

86.     On July 24, 2010, Lederer prepared a written assessment of the July 2009 plagiarism allegations against Helm. Although Lederer believed "the submitted evidence is sufficient to support an inquiry," she had seven questions that "could potentially alter this analysis." If Lederer would have asked Helm for input on the seven questions that "could potentially alter [her] analysis," Lederer may have found that an inquiry was not needed.

87.     Neither Ratterman nor Lederer sought information from Helm that could have resulted in the immediate dismissal of the research misconduct allegations against Helm. Ratterman knew that Helm's last day at the University was July 31, 2010, and she took steps to ensure that the "quite urgent" July 2009 plagiarism allegations would continue to be concealed from him. Ratterman concealed the allegations so that Helm would have no input on Lederer's assessment.

18

88.     Ratterman and Lederer had a duty to promptly notify Helm of Taylor's "quite urgent" July 2009 research misconduct allegations, Staat's July 2009 assessment of Taylor's allegation, and Lederer's July 2010 assessment of Taylor's allegation. Ratterman and Lederer failed to provide any notification to Helm until December 2010 about the research misconduct allegations, and then failed to notify Helm that the allegations were deemed "internal."

89.     Koshewa knew about Taylor's July 2009 plagiarism allegation against Helm by no later than June 22, 2010, but she also concealed those allegations from Helm. Koshewa had a duty to notify Helm of her improper and unethical involvement in the "life-altering" and "quite urgent" research misconduct allegations made against Helm in July 2009 by Taylor. Koshewa provided no such notification to Helm.

90.     Helm relied on Ratterman, Koshewa, and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him.

91.     The acts and omissions and fraudulent scheme and intent of Ratterman, Koshewa and Lederer, which were concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy. And neither Ratterman nor Koshewa nor Lederer advised Helm of his rights as a respondent in an "internal" research misconduct case. If Ratterman, Koshewa, or Lederer would have notified Helm of the plagiarism allegations, he could have demanded protection of his position and reputation at the University, and he could have demanded that his promotion be granted.

92.     In October 2009, Helm's promotion was rescinded due to accusations by his Department Chair Christine Cook and Division Director Lynn Parker that Helm was "stealing"

Taylor's research ideas. Helm received no notice of the proposed rescission of promotion, and was not provided an opportunity to learn about the "research concerns." Ratterman and Lederer had a duty to protect Helm's promotion. Their failure to do so caused massive and permanent damage to Helm's research reputation, and greatly interfered with his cancer research activities.

### Fraudulent Concealment No. 6 (July 30, 2010)

93.     On July 30, 2010, while he was still employed by the University, Helm met with Ratterman to discuss his concerns about research misconduct violations issues he learned about during his Faculty Grievance against Cook and Parker. Prior to the meeting, Helm prepared a document entitled "Points for Research Integrity Program" and he disclosed those "points" to Ratterman on July 30, 2010.

94.     On July 30, 2010, Helm advised Ratterman that Cook and Parker were making false accusations about his "research integrity" that were designed "to destroy my career." Ratterman concealed from Helm the research misconduct allegations filed by Taylor in July 2009. Ratterman had a continuing duty to inform Helm of these charges, which Ratterman described as being "quite urgent" in August 2009, so that Helm could protect his position and reputation at the University.

95.     Helm also told Ratterman: "At no time has anyone discussed with me my Research Integrity or the issues [Cook and Parker] were fussing about. This is the first opportunity I have had to tell anyone in authority about what has been going on. ... I am devastated that the people who have no integrity are given promotion and tenure [Parker] and I get fired."

96.     Helm further told Ratterman that "none of this could have happened if [Christine Cook] was not married to Larry Cook." Dr. Larry Cook was the University's Executive Vice President for Health Affairs. Helm provided a detailed timeline to Ratterman and emphasized that he had his research "taken away" with "no due process" and that his promotion to Professor was

"tabled." Ratterman remained silent on the "quite urgent" research misconduct allegations made against Helm in July 2009.

97.     Ratterman's notes from her meeting with Helm state, among other things, (a) Cook and Parker had accused Helm of being a plagiarist; (b) Helm's research had been place "on hold;" (c) Cook and Dr. Tracy Eells told Helm that his contract may not be renewed in August 2010 because of research issues and that Helm's research with Dr. Christopher States would be reassigned and all of his other research would be reviewed; (d) Helm's promotion to Professor had been "tabled" and Helm did not receive notice or an opportunity to respond to the tabling of the promotion; (e) without notice to Helm, Cook disconnected him from the University's email system and Citrix database; and (f) on November 2, 2009, Parker called a meeting of the Division to discuss Helm's research, but excluded Helm from the meeting.

98.     Although Ratterman described the plagiarism allegations made against Helm by Taylor as being "quite urgent" on August 13, 2009, she continued to conceal those allegations from Helm at the July 30, 2010 face-to-face meeting with Helm. And Ratterman concealed, until late 2015, from Helm that the allegations against him were deemed "internal."

99.     On August 2, 2010, Ombudsperson Staat noted numerous irregularities to the administration of the department and its research mission. Staat also noted a "dysfunctional organization which may be detrimental to the research profile of the University." Nevertheless, Staat recommended to Vice President for Research William Pierce that he found no apparent misconduct.

100.    On November 14, 2010, more than three months after receiving Staat's recommendation, Pierce assured Helm that "integrity in all [of the University's] endeavors is of utmost importance and we rely on members of our community to identify issues and concerns so that suitable action can be taken." Pierce determined that, even though "internal department issues

did seem to present, [Helm's] allegations do not fall within the policy definition of research misconduct." Pierce copied Ratterman on his letter to Helm.

101.    On July 30, 2010, Ratterman had a duty to notify Helm of Taylor's July 2009 research misconduct allegation, Staat's July 2009 assessment of the allegation, and Lederer's July 2010 assessment of the allegation. Ratterman failed to provide any notification to Helm until December 2010, and then waited until late 2015 to notify Helm that the allegations were "internal."

102.    Ratterman knew that Helm's last day at the University was July 31, 2010. In order to ensure that the July 2009 plagiarism allegations against Helm would continue to be concealed from him, Ratterman maintained her silence on the now-year old allegation against him, and did not ask any questions that may have exonerated Helm. Ratterman further concealed from Lead Ombudsperson Staat the timeline of events that Helm provided to her at the July 30, 2010 meeting.

103.    Helm relied on Ratterman to follow the ORI Policy, or any alternate research misconduct policy approved by the University's Vice President for Research, for any research misconduct allegation made against him.

104.    The acts and omissions of Ratterman on July 30, 2010, which were concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the University's ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy.

105.    If, on July 30, 2010, Ratterman would have disclosed that an Inquiry Panel had been formed in July 20, 2009 regarding research misconduct allegations that fell within the scope of the ORI Policy, Helm could have sought protection of his position, his promotion, and his reputation.

106.    As a direct and proximate result of the concealment of the above material facts by Ratterman, Helm lost his position, his promotion, his research, his patients, his referring physician

base, his professional, personal, and practice goodwill which had taken ten years to develop, and his

reputation at the University. Helm was also forced to sell his home in a down real estate market.

### Fraudulent Concealment No. 7 (August 2, 2010)

107.    On July 30, 2010, Ratterman provided the July 24, 2010 "assessment" of Associate

Ombudsperson Lederer to Lead Ombudsperson Staat for his review and comment.

108.    On August 2, 2010, Staat prepared comments to Lederer's July 24, 2010 assessment,

but first ran his comments by Ratterman for her consideration. Staat was "not convinced that an

inquiry [against Helm] is needed" and described his reasons for that position. But, Staat concluded,

"Rather than debate this point, I've asked [Ratterman] to identify experts through the literature and

send them the documents in question. They will be asked their opinion on whether or not scientific

plagiarism occurred." Ratterman responded to Staat's comments by stating, "That works." *(Ex. K)*

109.    After receiving Staat's August 2, 2010 comments, Lederer believed that "nothing

further was to be done" on Helm's research misconduct case. Ratterman and Lederer had a duty to

disclose to Helm that "nothing further was to be done" on the research misconduct allegation

against him. If Ratterman and Lederer had disclosed to Helm that "nothing further was to be done"

on the research misconduct allegation against him, he could have sought reinstatement to his

position at the University and his promotion would have been approved. "Research issues" were the

sole reasons Helm's employment contract was not renewed and his promotion was rescinded.

110.    Ratterman disregarded the express instructions of Lead Ombudsperson Staat and

Associate Ombudsperson Lederer, even though Ratterman testified that the Ombudsperson "has

the ultimate authority for the interpretation and administration of [the ORI] policy."

111.    Ratterman had a duty to follow the Ombudpersons' directive, but chose not to do so

because she wanted to ensure that the July 2009 plagiarism allegations against Helm would proceed

and that Helm would have no or minimal input regarding the allegations. If Ratterman decided to disregard the Ombudspersons' directive, she had a duty to notify Helm of the allegations against him. Ratterman did not notify Helm, and she took no further action on the matter for seven weeks.

112.    Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the Vice President for Research for any allegation made against him. The acts and omissions of Ratterman on August 2, 2010, which were concealed from Helm until late 2015, induced Helm to not invoke the numerous rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy.

113.    The concealed acts and omissions of Ratterman on August 2, 2010 also induced Helm to not take additional steps that could have restored his position, promotion, and research at the University. Helm's relationships with his patients and referring physicians would have also been restored, and his personal, professional, and practice goodwill would have remained intact. Helm would also not have been forced to leave his Louisville home.

### Fraudulent Concealment No. 8 <u>(August 25, 2010)</u>

114.    On August 24, 2010, Helm filed a defamation lawsuit against Christine Cook and Lynn Parker in the Jefferson Circuit Court, and he filed a complaint against the University with the Kentucky Board of Claims for its "negligent supervision" of Cook and Parker. On August 25, 2010, the complaint against the University was hand-delivered to Koshewa.

115.    On August 25, 2010, counsel for Helm also delivered a "litigation hold" letter to Koshewa, wherein Helm demanded that Koshewa preserve "all documents and electronic information and communications regarding Dr. Helm" and to "take the necessary steps to ensure that a litigation hold is submitted throughout the University for such documents." *(Ex. L)*

116.    By no later than August 25, 2010, Koshewa had a duty to preserve all documents and electronic information and communications regarding Helm and to take necessary steps to ensure that a litigation hold was submitted throughout the University for all such materials. Helm relied on Koshewa to preserve such materials and to submit a litigation hold throughout the University.

117.    Rather than preserving all documents relating to Helm and issuing a litigation hold throughout the University, Koshewa did not issue a litigation hold throughout the University and did not preserve all documents and electronic information and communications regarding Helm.

118.    The evidentiary damages to Helm arising from Koshewa's wanton and intentional disregarding has been massive and unmeasurable. The most critical documents relating to his claims against Cook and Parker, the University, and the defendants here, were either lost or deleted or destroyed – some intentionally – after Helm submitted to Koshewa the litigation hold. Koshewa concealed her disregard of the litigation hold demand until March 2017.

## Fraudulent Concealment No. 9 (September 24, 2010)

119.    By no later than September 24, 2010, Ratterman learned that CEGIB, who funded Helm's allegedly plagiarizing grant, was "funded by the National Institutes of Environmental Health and Sciences." Ratterman had a duty to disclose to Helm and others that CEGIB funding of Helm's grant application and award constituted federal or PHS funding. Ratterman had a duty to disclose to Helm and others that CEGIB funding of Helm's grant application and award constituted federal or PHS funding. Rather than disclosing her knowledge of the federal funding to Helm and Lederer, Ratterman instead met with Feldhoff and Koshewa on September 27, 2010 to discuss the implications of the federal funding of Helm's grant.

120.    Lederer did not evaluate whether Helm's CEGIB grant application and subsequent CEGIB award constituted "PHS" funding, and instead relied on Ratterman's "determination."

25

121.     In her November 2015 deposition, Ratterman testified that she wanted to meet with Koshewa on September 27, 2010 because she was "concerned" that Helm's CEGIB grant application and award was supported by federal or PHS funding: "My concern was that even though the [University] viewed Helm's grant as internal, core [CEGIB] funding is federal in nature."

122.     If Ratterman would have contacted Helm or anyone at CEGIB, she would have been told that CEGIB was supported almost entirely by federal funds, and that Helm's CEGIB grant application was supported by federal funds, and that Helm was required to credit the NIEHS grant to CEGIB on any research publication relating to his award.

123.     Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him. If Ratterman properly classified the complaint against Helm as being "within the scope" of the ORI Policy, all of the deadlines and due process requirements in the ORI Policy would have become mandatory.

124.     The acts and omissions of Ratterman, which were concealed from Helm until late 2015, induced Helm to not invoke the numerous rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy.

125.     In September 2010, Helm could have sought immediate reinstatement to the University and restoration to his position and reputation. His relationship with his patients and referring physicians would have been restored, his goodwill with referring physicians would have been restored, and he would not be forced to leave his Louisville home. He would also have all of his research rights restored and been reinstated as Principal Investigator on his research projects.

126.     Ratterman has either destroyed some or all of her notes relating to any analysis of whether Helm's CEGIB grant award involved federal funding, or is claiming that her notes are protected from disclosure under the attorney-client privilege or work product doctrine. These actions have denied Helm access to a source of proof and evidence in all Helm research misconduct proceedings (including court actions) that may support his claim.

### Fraudulent Concealment No. 10 (September 27, 2010)

127.     On September 27, 2010, Ratterman, Koshewa, and Feldhoff met to discuss, among other things, the implications of the federal or PHS funding of Helm's CEGIB grant application and award. They concealed their meeting from Helm, and he was denied the opportunity to provide truthful and important information to them about his CEGIB grant application and award.

128.     Ratterman, Koshewa, and Feldhoff also excluded Lead Ombudsperson Staat and Associate Ombudsperson Lederer from the meeting even though Ratterman testified under oath that Lederer was "in charge of [Helm's] case" and "was supposed to make all of the decisions in [Helm's] case pursuant to the [ORI] Policy."

129.     Lederer testified that it "bothers" her that Ratterman consulted with Koshewa about the claims being asserted against Helm, and for which Lederer was the Ombudsperson.

130.     Lead Ombudsperson Staat testified that Ratterman cannot justify her September 27, 2010 meeting with Koshewa while excluding the Ombudspersons. Staat further testified that Koshewa should not have been reviewing the research misconduct allegation against Helm.

131.     The ORI Policy contains no provision for a "review" of research misconduct allegations that does not involve the participation of either Ombudspersons Staat or Lederer. Nothing in the ORI Policy permits Ratterman, Koshewa, or Feldhoff to make decisions or provide advice on whether an allegation falls within the "scope" of the policy.

27

132.    Feldhoff testified that CEGIB was "externally funded," i.e., federally funded and that Helm's CEGIB grant is a "federal flow through" and that 93% of the originated from the NIH.

133.    Even though Ratterman, Feldhoff, and Koshewa knew that federal or PHS funds supported Helm's CEGIB grant application and award, they designed a fraudulent scheme that would deny all due process protections with the express purpose of manufacturing a research misconduct finding against Helm. Such a result would inure to the benefit of the University, whom Helm had sued in the Kentucky Board of Claims on August 24, 2010.

134.    Ratterman, Koshewa, and Feldhoff had a duty to disclose to Helm and others that they were meeting to discuss the status of the research misconduct allegations against Helm that were now more than 14 months old.

135.    Because Helm had sued the University on August 24, 2010 in the Kentucky Board of Claims, Koshewa had an obvious conflict of interest. Nevertheless, Koshewa wanted to ensure that Helm was thereafter deprived of all rights and interests under the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy.

136.    On August 24, 2010, Helm had also sued Christine Cook for making defamatory statements about his "research integrity" to numerous people. Koshewa and Feldhoff maintained personal and professional relationships with Cook and her husband, Dr. Larry Cook. In August 2010, Dr. Larry Cook was the highest administrator for the Health Sciences Campus.

137.    So, Koshewa, Feldhoff, and Ratterman designed a scheme that sought to gut Helm's defamation claim and benefit Cook. They based their plan around depriving Helm of all of rights relating to the plagiarism allegations made against him in July 2009 by Taylor, and by attempting to fraudulently manufacture a research misconduct finding against Helm. Then, the University could

28

seek to dismiss the Board of Claims action against them, and Christine Cook could move to dismiss the defamation claim against them in Jefferson Circuit Court.

138.    If Koshewa, Ratterman, and Feldhoff were going to use a process other than the one in the ORI Policy to the "quite urgent" research misconduct allegations against Helm, they had a duty to disclose that alternative process to Helm. No one ever disclosed to Helm that any process other than the ORI Policy process would be used to evaluate the allegations made against him.

139.    Helm relied on Ratterman, Koshewa, Feldhoff, and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him.

140.    The acts and omissions of Ratterman, Koshewa, and Lederer, which were concealed from Helm until late 2015, induced Helm to not invoke the numerous rights and protections of the University's ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy.

141.    If Ratterman, Koshewa, and Feldhoff properly classified the complaint against Helm as being "within the scope" of the ORI Policy, all of the deadlines and due process requirements in the policy would have become mandatory. Helm could have sought immediate reinstatement to the University and restoration to his position and reputation. His relationship with his patients and referring physicians would have been restored, his personal, professional, and practice goodwill would have remained intact, and he would not be forced to leave his Louisville home.

142.    Koshewa either permitted or ordered the deletion and destruction of certain records which could harm the University's position, or the positions of Christine Cook. Feldhoff failed to keep any records of the meeting, and consistently testified that the "does not recall" what happened at the meeting or any directions that she or Koshewa provided to Ratterman at the meeting.

29

143.     As a result of the conduct of Ratterman, Koshewa, Feldhoff, and Lederer, Helm has been deprived of multiple sources of evidence, including critical documentary evidence relating to his claims against Christine Cook and Lynn Parker, and to his claims against the University in Division 7 of the Jefferson Circuit Court, and to his claims in this action.

**Fraudulent Concealment No. 11 (September 28, 2010)**

144.     Following their secret meeting on September 27, 2010, Ratterman, Koshewa, and Feldhoff began implement their plan to manufacture research misconduct finding against Helm.

145.     On August 2, 2010, Ombudspersons Staat and Lederer told Ratterman that (i) an inquiry against Helm was not needed and (ii) the only thing Ratterman needed to do was "to identify experts through the literature and send them the documents in question. They will be asked their opinion on whether or not scientific plagiarism occurred." *(Ex. K)*

146.     If Ratterman, Koshewa, and Feldhoff intended to disregard the directions of Staat and Lederer, they had a duty to notify Helm, Staat, and Lederer of their intentions to prosecute a research misconduct case against Helm against the advice of the Ombudspersons.

147.     On September 28, 2010, Ratterman sent an email to Lederer and asked who she "would like to seat on the Inquiry Panel." *(Ex. M)* A confused Lederer responded, "This is a bit of a surprise. I had thought from Dr. Staat's [August 2, 2010] note to me that nothing further was to be done." *(Ex. N)* Ratterman tersely responded, "We are ready to move to the next stage." *(Id.)*

148.     Lederer testified that, as Associate Ombudsperson, she was "going to apply the steps" set forth in the ORI Policy to the research misconduct allegations against Helm. After hearing from Ratterman on September 28, 2010, Lederer decided to not apply the steps of the ORI Policy.

149.     If Ratterman or Lederer were going to use a process other than the one in the ORI Policy to the plagiarism allegations against Helm, they had a duty to (a) obtain permission from the

Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm. Until late 2015, no one ever disclosed to Helm that any process other than the ORI Policy process would be used to evaluate the research misconduct allegations made against him.

150.   Ratterman, Koshewa, Feldhoff, and Lederer had a duty to notify Helm of their intentions to pursue a research misconduct case against Helm outside of the parameters of the ORI Policy, and the "Executive Vice President for Research must approve any significant variation in procedure prior to its initiation" and "[a]ny change from normal procedures must ensure fair treatment to the subject of the inquiry or investigation." *(Ex. A, p. 4)*

151.   Helm relied on Defendants to follow the ORI Policy or any alternate research misconduct policy approved by the Vice President for Research. The acts and omissions of Ratterman, Koshewa, and Feldhoff, which were concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy, and also induced Helm to not take additional steps that could have restored him to his position at the University and restored his promotion to professor.

152.   In September 2010, Helm could have sought immediate reinstatement to the University and the restoration to his position, reputation, and research. His relationship with his patients and referring physicians would have been restored, his personal, professional, and practice goodwill would have remained intact, and he would not be forced to leave his Louisville home.

153.   As a result of Defendants' conduct, Helm has been deprived of multiple sources of evidence, including critical documentary evidence relating to his claims against Christine Cook and Lynn Parker, and to his claims against the University in Division 7 of the Jefferson Circuit Court, and to his claims in this action.

154.     As a result of Defendants' conduct, Helm was subjected to an unprecedented, ad hoc, arbitrary, destructive, and grossly unfair research misconduct process that is not described in any University policy. Lead Ombudsperson Staat found it "disturbing" for an ad hoc process to be used in the plagiarism case against Helm, and he was "concerned" that Helm was subjected to a process where guidelines were routinely not followed and notifications were hardly ever given.

**Fraudulent Concealment No. 12 (October 13, 2010)**

155.     Pursuant to the ORI Policy, Associate Ombudsperson Lederer, "in consultation with other institutional officials as appropriate, will appoint an inquiry committee and committee chair within 10 business days of the initiation of the inquiry or as soon thereafter as practical." *(Ex. A, p. 14)* The "second" Inquiry Panel was selected on October 13, 2010.

156.     Pursuant to the ORI Policy, Lederer "will prepare a charge for the Inquiry Panel that sets forth the time for completion of the inquiry [and] describes the allegations and any related issues identified during the allegation assessment [and] states that the purpose of the inquiry is to conduct an initial review of the evidence, including the testimony of the respondent … to determine whether an investigation is warranted…." *(Id., p. 15)* Lederer did not prepare a charge relating to Helm.

157.     Pursuant to the ORI Policy, the Inquiry Panel "will normally interview the Respondent." *(Id.)* In order to perpetrate their ongoing fraud against Helm, Ratterman and Lederer would not allow the Inquiry Panel to interview anyone, including Helm.

158.     Pursuant to the ORI Policy, Lederer "will prepare a charge for the Inquiry Committee that states that an investigation is warranted if the committee determines (1) there is a reasonable basis for concluding that the allegation falls within the definition of research misconduct and is within the jurisdictional criteria of 42 CFR § 93.102(b); and (2) the allegation may have substance, based on the committee's review ..." *(Id., p. 14)* Lederer, relying on the assistance of

32

Ratterman, prepared no such charge to the Inquiry Panel reviewing the research misconduct allegations against Helm.

159.    Pursuant to the ORI Policy, Lederer was required to advise Helm that, during the review process, he will have an advisor of his choice. Lederer, relying on advice from Ratterman, decided that Helm would not receive that notification, and concealed their decision from Helm.

160.    Pursuant to the ORI Policy, Lederer was to call for a "first meeting" of the Inquiry Committee to, among other things, "discuss the allegations, any related issues, and the appropriate procedures for conducting the inquiry..." *(Ex. A, p. 15)*

161.    On November 16, 2010, Ratterman e-mailed the committee to "schedule the initial meeting of the Inquiry Panel. …At the initial meeting, the panel will be provided with the allegation materials as well as the guidelines/scope of the panel's duties. We will need about 60 minutes for the meeting." The Inquiry Committee's "first meeting" took place on November 30.

162.    Helm relied on Ratterman and Lederer to follow the ORI Policy, or any alternate research misconduct policy approved by the Executive Vice President for Research, for any research misconduct allegation made against him at the University.

163.    If Ratterman or Lederer were going to use a process other than the process set forth in the ORI Policy to the research misconduct allegations against Helm, they had a duty to (a) obtain permission from the Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm. Until late 2015, no one disclosed to Helm that any process other than the ORI Policy would be used to evaluate the allegations against him.

164.    In an effort to conceal and obstruct their fraudulent scheme, copies of notes from the Inquiry Panel's November 30, 2010 meeting – wherein Ratterman provided to the panel "guidelines/scope of the panel's duties – have been deleted or destroyed or withheld from Helm.

165.     The Defendants' concealed their acts and omissions from Helm until late 2015, and they induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Executive Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy, and also induced Helm to not take additional steps that could have restored his position and promotion to professor.

166.     In October 2010, Helm could have sought reinstatement to the University and restoration to his position, reputation, and research. His relationship with his patients and referring physicians would have been restored, his personal, professional, and practice goodwill would have remained intact, and he would not be forced to leave his Louisville home.

167.     As a result of the conduct of Ratterman, Koshewa, Feldhoff, and Lederer, Helm was subjected to an unprecedented, ad hoc, arbitrary, destructive, and grossly unfair research misconduct process that is not described in any University policy. Lead Ombudsperson Staat found it "disturbing" for an ad hoc process to be used against Helm, and he was "concerned" that Helm was subjected to a process where guidelines were not followed and notifications were hardly ever given.

### Fraudulent Concealment No. 13 (December 6, 2010)

168.     Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the Executive Vice President for Research for any research misconduct allegation made against him at the University. If Ratterman or Lederer were going to use a process other than the process set forth in the ORI Policy to the research misconduct allegations against Helm, they had a duty to (a) obtain permission from the Executive Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm. Until late 2015, no one disclosed to Helm that any process other than the ORI Policy would be used to evaluate the research misconduct allegations against him.

169.    On December 6, 2010, Lederer advised Helm – for the first time and nearly 17 months after Taylor filed his research misconduct complaint – that a plagiarism claim had been alleged against him. But Lederer gave to Helm none of the information or items she was required to provide pursuant to the ORI Policy.

170.    Lead Ombudsperson Staat testified that Helm should have received a copy of the ORI Policy and that Helm should have been notified of the names of the Inquiry Panel members. But Lederer testified that Helm "would have to ask me" for the Inquiry Panelists' names. No University policy places the burden on a research misconduct respondent to ask for information about allegations made against him or her.

171.    In a draft of the notification to Helm, Lederer and Ratterman included the names of the Inquiry Panel members. But Lederer or Ratterman scratched out the names of the Inquiry Panel members. Ratterman testified that scratching out the names of Inquiry Panel members in the notification to Helm is not consistent with the ORI Policy.

172.    The Defendants' acts and omissions, which were concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Executive Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy and also induced Helm to not take additional steps that could have restored his position or promotion. Helm's relationship with his patients and referring physicians would have been restored, his personal and professional goodwill would have remained intact, and he would not be forced to leave his Louisville home. He would also have all of his research rights restored.

173.    As a result of Defendants' conduct, Helm was subjected to an unprecedented, ad hoc, arbitrary, destructive, and grossly unfair research misconduct process that is not described in

35

any University policy. Lead Ombudsperson Staat found it "disturbing" for an ad hoc process to be used in the plagiarism case against Helm, and he was "concerned" that Helm was subjected to a process where guidelines were not followed and notifications were hardly ever given.

### Fraudulent Concealment No. 14 <u>(December 8, 2010 through January 27, 2011)</u>

174.     On December 8, 2010, an Inquiry Panel member, Dr. Barbara Clark, compared Helm's CEGIB study with Taylor's NIH grant, allegedly plagiarized by Helm, and formulated three questions that would inform her analysis. These questions were never presented to Helm. On December 13, 2010, without interviewing Helm or seeking relevant records from him, Clark determined that the plagiarism claims "warranted further investigation."

175.     On December 12, 2010, an Inquiry Panel member, Dr. Rafael Perez, analyzed the claims against Helm and recommended "further investigation of potential misconduct." Perez made this analysis and recommendation without interviewing or seeking records from Helm. Perez also lamented that Inquiry Panel member Clark "poses good questions that, for better or worse, we do not have the information to address."

176.     The ORI Policy requires "a written inquiry report" to include a description of the allegations of research misconduct; the PHS support, including, for example, grant numbers, grant applications, contracts and publications listing PHS support; the basis for recommending that the allegations warrant an investigation; and my comments on the draft report. *(Ex. A, p. 15)*

177.     Neither of the Clark and Perez analyses described the PHS support of Helm's CEGIB grant, even though Defendants that Helm's grant was supported by federal funds.

178.     The ORI Policy states, "Institutional counsel should review the [Inquiry] report for legal sufficiency." *(Ex. A, p. 15)* Koshewa did not review the analyses of Clark and Perez, because she knew they did not comply with the ORI Policy.

36

179.   The ORI Policy required Lederer to notify Helm whether the inquiry found an investigation to be warranted; give him a copy of the draft inquiry report and advise him that he may comment on the draft inquiry report within 10 business days; and give him a copy of 42 C.F.R. Part 93 or the Institution's ORI Policy. *(Ex. A, p. 16)*

180.   As part of their fraudulent scheme, Lederer, relying on the advice of Ratterman, did not (a) notify Helm whether the inquiry found an investigation to be warranted; (b) include a copy of the draft inquiry report and give him an opportunity to respond; and (c) provide Helm with a copy of 42 C.F.R. Part 93 or the ORI Policy.

181.   Lederer, relying on the advice of Ratterman, declined to provide Helm with the analyses of Clark and Perez or a copy of the ORI Policy, and concealed her decisions from Helm.

182.   Defendant Feldhoff and Lead Ombudsperson Staat testified that Helm should have been allowed to comment on the Inquiry panelist's "assessments."

183.   The Inquiry Panel consulted with Lederer to determine whether an investigation was warranted against Helm, but she "doesn't remember the date of the consultation" and has deleted or destroyed any of her notes with the Inquiry Panel members.

184.   The above decisions of Lederer and Ratterman, which were deliberately concealed from Helm, precluded Helm from offering any information that could have led the Inquiry Panel members to conclude that the allegations of research misconduct against him were meritless.

185.   On December 31, 2010, Lederer prepared a "cover letter" to the Deciding Official, Dr. William Pierce, stating that the Inquiry Panel had reviewed the plagiarism allegations against Helm and had "determined that the allegations merit further investigation." Ratterman and Lederer concealed the formal report and the December 31, 2010 "cover letter" from Helm. On January 3, 2011, Ratterman approved Lederer's "cover letter" to Pierce and forwarded it to him.

186.    On January 27, 2011, Pierce accepted the "recommendation of the Inquiry Panel" and said that "to uphold the highest levels of research integrity, the institution should proceed with the next phase of the process to determine if research misconduct occurred." Although Ratterman and Lederer had a duty to notify Helm of this fact, they concealed it from Helm as part of their fraudulent scheme to manufacture a research misconduct finding against Helm.

187.    On January 28, 2011, Ratterman advised Lederer that the case against Helm "was moving forward to an investigation." Although Ratterman and Lederer had a duty to notify Helm of this fact, they concealed it from Helm as part of their fraudulent scheme to manufacture a research misconduct finding against Helm. Feldhoff and Staat testified that Helm should have been notified that the case was proceeding to an investigation.

188.    Helm relied on Ratterman and Lederer to follow the ORI Policy, or any alternate research misconduct policy approved by the University's Vice President for Research, for any research misconduct allegation made against him at the University.

189.    If Ratterman or Lederer were going to use a process other than that set forth in the ORI Policy to the plagiarism allegations against Helm, they had a duty to (a) obtain permission from the Executive Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm. Until late 2015, no one disclosed to Helm that any process other than the ORI Policy would be used to evaluate the research misconduct allegations against him.

190.    The acts and omissions of Defendants, which were concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Executive Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy, and induced him to not take additional steps that could have protected his position and promotion at the University.

38

191.    The acts and omissions of Ratterman and Lederer deprived Helm access to critical pieces of proof and evidence in all Helm research misconduct proceedings (including court actions), including the communications between Lederer and the Inquiry Panel.

192.    As a result of the conduct of Ratterman and Lederer, Helm was subjected to an unprecedented, ad hoc, arbitrary, destructive, and grossly unfair research misconduct process that is not described in any University policy. Ombudsperson Staat found it "disturbing" for an ad hoc process to be used against Helm, and he was "concerned" that Helm was subjected to an ad hoc process where guidelines were not followed and notifications were hardly ever given.

**Fraudulent Concealment No. 15 (February 22, 2011 through July 6, 2011)**

193.    The ORI policy required Lederer, "on or before the date on which the investigation begins," to notify Helm "in writing of the allegations to be investigated." *(Ex. A, pp. 16-17)* Ratterman and Lederer provided no notice to Helm. Lederer admitted at her deposition that it "was not reasonable" to withhold notification to Helm of the investigation being opened against him. Feldhoff also admitted that Helm should have been notified of the investigation.

194.    Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the University's Vice President for Research for any research misconduct allegation made against him at the University.

195.    If Ratterman or Lederer were going to use a process other than the process set forth in the ORI Policy to the research misconduct allegations against Helm, they had a duty to (a) obtain permission from the Vice President for Research to use an alternate process and (b) disclose and describe that alternate process to Helm. Until late 2015, no one disclosed to Helm that any process other than the ORI Policy process would be used to evaluate the misconduct allegations against him.

39

196.     On February 22, 2011, Dr. Ratterman requested Drs. Ralph Perez, Mike Marvin, Mark Slaughter, Brian Wattenberg, and Charles Woods to serve on the five person "In Depth Review" panel relating to the allegations against Helm. The ORI Policy does not contain a provision for assembling an "In Depth Review" Panel.

197.     Helm relied on Ratterman and Lederer to follow the ORI Policy or any alternate research misconduct policy approved by the Executive Vice President for Research for any research misconduct allegation made against him.

198.     In the past 15 years, the research misconduct case against Helm was the only case at the University that was submitted to an "In Depth Review" Panel. None of the Defendants advised Helm about his rights regarding the "In Depth Review" Panel. In late 2015, veteran Lead Ombudsperson Staat testified that he had never has not heard of In Depth Review Panel.

199.     Defendants had a duty to disclose to Helm what his rights were under this unprecedented process. But Defendants concealed their acts and intentions from Helm, who relied on Defendants to follow University policies and procedures. In November 2015, Staat testified that Ratterman may have gone out of her way to make sure that the case against Helm would be called something other than an "Investigation."

200.     Defendants created this unprecedented, arbitrary, ad hoc, deceptive, and grossly unfair "In Depth Review" Panel in an effort to manufacture and fraudulently obtain a research misconduct finding against Helm. Upon such a finding, both the University and Cook and Parker could have then moved for dismissal of Helm's 2010 complaints against them.

201.     The ORI Policy required Lederer or Ratterman to notify Helm of the proposed membership of the Investigation Committee, and give him days to object to any member based upon a conflict of interest. *(Ex. A, p. 17)* In furtherance of their fraudulent scheme to manufacture a

research misconduct finding against Helm, Ratterman and Lederer provided no notice to Helm of the Investigation (or "In Depth Review) Committee, and he was not given an opportunity to object to any member of that committee.

202.    Lead Ombudsperson Staat testified that Helm should have been notified of the names of the Investigation or "In Depth Review" Panel members.

203.    The ORI Policy required Lederer and Ratterman, on or before the date on which the investigation begins, to notify the Director of the federal Office of Research Integrity "of the decision to begin the investigation and provide ORI a copy of the inquiry report." *(Ex. A, p. 17)* Ratterman and Lederer provided no notice or documents to the federal Office of Research Integrity, because such notice may have exposed their fraudulent scheme to manufacture a research misconduct finding against Helm.

204.    The ORI Policy required Lederer to "take reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practical." As set forth above, Ratterman and Lederer took every step to make sure that the investigation against Helm was partial and biased.

205.    For example, even though Ratterman and Lederer were required to "pursue diligently all significant issue and leads discovered that are relevant to the investigation, Ratterman and Lederer failed to even advise Helm that he could call his own witnesses to testify at the "investigation" or "in depth review" stage.

206.    Ratterman and Lederer also took steps to scrub from all documents presented to the Investigation or "In Depth Review" Committee references to federal funding of Taylor's NIH grant and Helm's CEGIB grant application and award. Ratterman and Lederer intentionally withheld from the panel Taylor's National Institute of Cancer grant number (1R41CA139802-01) and the NIEHS grant number (NIH ES014443) disclosed on Helm's CEGIB application.

207.     In further violation of the ORI Policy, Ratterman and Lederer also took steps to ensure that the "report" from the Investigation or "In Depth Review" Panel did not "describe and document the PHS support, including, for example, the numbers of any grants that are involved, grant applications, contracts, and publications listing PHS support." *(Ex. A, p. 19)* Ratterman and Lederer failed to notify the panel of Taylor's National Institute of Cancer grant number (1R41CA139802-01) and the NIEHS grant number (NIH ES014443) disclosed on Helm's CEGIB application. Feldhoff testified that she does not know why Ratterman omitted the funding source from the charge to the Investigation Panel.

208.     Associate Ombudsperson Lederer testified that Ratterman prepared the "Charge" to the Investigation or "In Depth Review" Panel, and that Helm "would have to ask Ratterman" why she deleted all references to PHS support in the charge. Lead Ombudsperson Staat testified that "has concerns" that Ratterman was corrupt or incompetent in the Helm research misconduct case.

209.     Feldhoff testified that the "In Depth Review Panel" should have been called Investigation Panel because no University policy contemplates an "In Depth Review Panel." Feldhoff testified that she does not know why Ratterman used the phrase "In Depth Review Panel."

210.     Ratterman and Lederer either deleted or destroyed any written communications they exchanged in 2011 regarding the ramifications of using an "In Depth Review" Panel, or they made sure that no documentary evidence was created regarding this plan.

211.     Defendants' acts and omissions, which they concealed from Helm until late 2015, induced Helm to not invoke the rights and protections of the ORI Policy, any alternate research misconduct policy approved by the Executive Vice President for Research, the Redbook, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy, and induced Helm to not take steps that could have restored his position and promotion at the University.

212.    In April 2011, although Helm was unaware that an investigation had been initiated, he provided to Lederer his resume. On May 23, 2011, the Investigation or "In Depth Review" Panel interviewed Helm and a witness that Helm, on his own initiative, recommended that the panel interview. Upon the conclusion of the interviews of Helm and his witness, the "In Depth Review" Panel promptly concluded that the plagiarism allegations against Helm were meritless.

213.    Not only did the panel conclude that the allegations against Helm were meritless, one panelist prepared a supplemental report which stated: "The decision of nonrenewal of [Helm's] contract may be an example of conflict of interest within the Division [of Gynecologic Oncology] and the Department [of Obstetrics, Gynecology and Women's Health] that was not in the best interest of the School of Medicine or its missions." *(Ex. O)* Ratterman and the University refused to examine this issue and withheld this document from Helm until 2016.

214.    On July 6, 2011, the Investigation or "In Depth Review" Panel issued its findings and recommendations to "Deciding Official" Pierce, and exonerated Helm on all research misconduct charges. The ORI Policy required Lederer to give Helm a copy of the draft report for comment. Ratterman and Lederer intentionally concealed this report from Helm. On information and belief, Defendants withheld this document from Helm to buy time to formulate another strategy to manufacture a research misconduct finding against Helm.

215.    On August 11, 2011, Pierce wrote to Helm and notified him that he had been exonerated of the plagiarism charge. By this time, however, Helm had lost his position, his promotion, his research, his academic reputation, his patients and referral sources, and his personal, professional, and practice goodwill. Due to Defendants' fraudulent scheme and intent, Helm's exoneration on the plagiarism charge was pyrrhic and symbolic and at an enormous cost to Helm.

43

**Fraudulent Concealment No. 16 (February 25, 2015)**

216.    On February 25, 2015, John Butler from the federal Office of Research Integrity informed Ratterman that the federal Division of Investigative Oversight ("DIO") "would have asserted jurisdiction" in the research misconduct case against Helm. On March 24, 2015, the DIO Director, Dr. Susan Garfinkel, informed Ratterman:

> The [DIO] has reviewed the summary of the investigation conducted by the University of Louisville into an allegation of research misconduct in the form of plagiarism by [Dr. Helm]. DIO determined that the source material for the alleged plagiarism was [Dr. Doug Taylor's] grant application R41 CA139802-01 submitted to the National Cancer Institute (NCI), National Institutes of Health (NIH). Thus, this matter falls under ORI's jurisdiction.

Ratterman had a duty to notify Helm of the DIO's determination. Because that would further expose the Defendants' fraudulent scheme, however, Ratterman withheld the Butler and Garfinkel communications from Helm until 2016.

217.    On December 7, 2015, notwithstanding the clear statements from the DIO at the federal Office of Research Integrity, the University, with Ratterman's approval, filed a pleading in the Jefferson Circuit Court that flatly contradicted the information provided by the DIO:

> [I]t is not true that the University violated the [ORI] Policy as this policy was not applicable to the case against Helm because it did not fall within the scope of the [ORI] Policy.
>
> [I]n order to determine whether an allegation of plagiarism falls within the scope of [ORI] Policy, the relevant inquiry is whether or not *the document containing the plagiarism* involved PHS [Public Health Services] support, and not whether *the document plagiarized* involved PHS support. … Therefore, it is irrelevant whether Taylor's grant application, the document from which the "ideas were taken" involved PHS support. The determination of whether Taylor's allegation against Helm involved PHS support, and thus fell within the scope of the [ORI] Policy, depended on whether the document that contained the "plagiarism," Helm's CEGIB grant, involved PHS support.
>
> Dr. Ratterman testified that, early in the research misconduct proceeding, Helm's CEGIB grant was classified as "internal," i.e., not involving PHS support. … This determination was made by Dr. Ratterman …

44

218.     All of the above conduct constitutes evidence of Defendants' continuing fraud against Helm, and supports the application of equitable tolling to Helm's claims against Defendants.

## COUNT I – FRAUDULENT CONCEALMENT AND FRAUD BY OMISSION

219.     Helm incorporates by reference the allegations set forth in paragraphs 1-218.

220.     The actions and omissions set forth above invoke equitable tolling of any applicable statute of limitation defense against Helm.

221.     The actions and omissions set forth above constitute evidence of fraudulent concealment and fraud by omission.

222.     As a result of Defendants' conduct, Helm has suffered the loss of his position at the University. He has suffered and will suffer (a) substantial losses in earnings, job experience, and benefits he would have enjoyed absent such conduct; (b) enormous damage to his academic reputation and the destruction of his research activities; and (c) emotional and physical stress.

223.     Defendants' actions were willful, wanton, malicious, and oppressive, and justify the awarding of punitive and exemplary damages.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT

224.     Helm incorporates by reference the allegations set forth in paragraphs 1-223.

225.     The actions and omissions set forth above invoke equitable tolling of any applicable statute of limitation defense against Helm.

226.     In 2009, Helm possessed important contractual rights at the University, including but not limited to his annual faculty appointment rights under the Redbook, and his rights under the ORI Policy, the Code of Conduct, the Non-Retribution Policy, and the PAT Policy. Defendants knew or should have known of Helm's contractual rights and, by engaging in the above conduct, tortiously interfered with Helm's contractual rights.

45

227.     As a result of Defendants' conduct, Helm has suffered the loss of his position at the University. He has suffered and will suffer (a) substantial losses in earnings, job experience, and benefits he would have enjoyed absent such conduct; (b) enormous damage to his academic reputation and the destruction of his research activities; and (c) emotional and physical stress.

228.     Defendants' actions were willful, wanton, malicious, and oppressive, and justify the awarding of punitive and exemplary damages.

## COUNT III – INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

229.     Helm incorporates by reference the allegations set forth in paragraphs 1-228.

230.     The actions and omissions set forth above invoke equitable tolling of any applicable statute of limitation defense against Helm.

231.     In 2009, Helm's experience as a teacher, surgeon, and researcher at the University provided him with a valid business relationship or expectancy. By engaging in the above conduct, Defendants interfered with Helm's prospective business advantage.

232.     As a result of Defendants' conduct, Helm has suffered the loss of his position at the University. He has suffered and will suffer (a) substantial losses in earnings, job experience, and benefits he would have enjoyed absent such conduct; (b) enormous damage to his academic reputation and the destruction of his research activities; and (c) emotional and physical stress.

233.     Defendants' actions were willful, wanton, malicious, and oppressive, and justify the awarding of punitive and exemplary damages.

## COUNT IV – BREACH OF FIDUCIARY DUTIES

234.     Helm incorporates by reference the allegations set forth in paragraphs 1-233.

235.     The actions and omissions set forth above invoke equitable tolling of any applicable statute of limitation defense against Helm.

236.     In their capacities as persons involved in the Office of Research Integrity at the University of Louisville, Defendants owed special and heightened duties to faculty members such as Helm who may be accused of research misconduct. By engaging in the above conduct, Defendants breached their fiduciary duties to Helm.

237.     As a result of Defendants' conduct, Helm has suffered the loss of his position at the University. He has suffered and will suffer (a) substantial losses in earnings, job experience, and benefits he would have enjoyed absent such conduct; (b) enormous damage to his academic reputation and the destruction of his research activities; and (c) emotional and physical stress.

238.     Defendants' actions were willful, wanton, malicious, and oppressive, and justify the awarding of punitive and exemplary damages.

WHEREFORE, Helm respectfully requests judgment for:

A.     Declaration that Defendants' actions and omissions constitute fraud by omission and fraudulent concealment, tortious interference with contract, international interference with prospective advantage, and breach of fiduciary duties;

B.     Compensatory and punitive damages in an amount to be determined at the jury trial;

C.     An award of his costs herein expended, including a reasonable attorney fee; and

D.     Any further legal or equitable relief which the Court may deem appropriate.

Respectfully submitted,

/s/ MICHAEL W. OYLER
Michael W. Oyler
John S. Reed
REED WEITKAMP SCHELL & VICE PLLC
500 West Jefferson Street, Suite 2400
Louisville, Kentucky  40202
(502) 589-1000
*Counsel for Plaintiff*